UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

UNITED STATES of AMERICA,

        Plaintiff

vs                                    Case No. 22-cr-20630
                                      Hon. David M. Lawson

NOPPHADON NINSAWAT,

        _____Defendant

## DEFENDANT'S MOTION TO VOID MIRANDA WAIVER AND SUPPRESS STATEMENTS

    Defendant NOPPHADON NINSAWAT, by his attorney, Jonathan M. Epstein, moves to void the Miranda waiver and suppress all statements made to Homeland Security Investigations on November 9, 2022, pursuant to Fed. R. Crim. P. 12(b)(3)(C) and the Fifth Amendment as involuntary as extracted by intimidation and coercion, and in support, states:

    1.    Mr. Ninsawat is charged by Indictment with eight counts relative to the sexual exploitation of a minor, 18 USC 2251(a), 18 USC 2252A(a)(2), 18 USC 2242(b), et al. (R. 14; Indictment).

    2.    The Indictment arises from private solicitations of Ninsawat by a young woman (MV-1) who misrepresented her age as eighteen (18) years and the subsequent execution of a search warrant on Mr. Ninsawat's home by HSI on November 9, 2022, at approximately 5:30 a.m.

    3.    At the time, Mr. Ninsawat was 31 years of age, a large mail machinery technician employed by Blue Crest Company, with no prior criminal record or contacts with law enforcement, a disabled veteran under the care of the Veteran's Administration for a collapsed lung and other ailments having received an honorable medical discharge from the U.S. Army.

4. In the early morning hours of November 9, 2022, at approximately 5:50 a.m. when still dark, Mr. Ninsawat was in the driveway of his home, located in a quiet suburban "bedroom" community on Ward St., Southgate, Michigan, to leave for work.

5. At that time, Mr. Ninsawat was confronted with multiple unmarked large para-military vehicles, lining the street, including a tank-like armored truck, and dozens of camouflaged officers in tactical military gear, para-military vests, helmets, body armor, AR-15 assault weapons pointed directly at him.

6. Further, the paramilitary-style armored vehicle had a very loud "loudspeaker" broadcasting a loop of instructions to Ninsawat instructing him to come out with hands up, "police search warrant" and other loud commands and he followed those commands.

7. Mr. Ninsawat was "terrified" as he had experienced "simulated combat" at Fort Leonard, Missouri where he trained at night doing a "low crawl" while live rounds from assault weapons were fired above his head and Ninsawat is well aware of the fatal damage an AR-15 assault rifle can inflict on the body. (Affidavit to be provided).

8. At this time, Mr. Ninsawat, with assault weapons pointed at him, was handcuffed and placed on the curb of Ward Street where he observed armed para-military soldiers forcefully removing his mother from his home (from her bed) into the cold morning dressed only in a robe, "smashing" his laptop and work cellphone in his backpack and ransacking his home.

9. Under these extreme and violent conditions, shocking in the United States of America, Ninsawat was placed in an unmarked black Escalade by Agent Alley, in tactical gear and armed, who told him to sign a form (the *Miranda* waiver) and did as instructed; Mr. Ninsawat was unaware he had a choice in the matter.

10. Amid this inherently coercive procedure, Mr. Ninsawat was interrogated in the back seat of the Escalade, answered questions and made incriminating statements.

11. Following the interrogation, Mr. Ninsawat was instructed to follow agents back to an unknown building where he was subjected to a polygraph examination wherein, he made additional incriminating statements.

12. In this "war zone" Mr. Ninsawat's statements were not the product of free will but of fear, overwhelming force, duress, coercion and displays of armed threats of force by a paramilitary unit directed at him, his mother, his home and property.

13. The Fifth Amendment's prohibition against coerced confessions rests upon a fundamental premise; "'that ours is an accusatorial and not an inquisitorial system—a system in which the State must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth.'" *Arizona v. Fulminante*, 499 U.S. 279 (1991) (quoting *Rogers v. Richmond*, 365 U.S. 534, 540-41 (1961)).

14. That is precisely what occurred here; if Mr. Ninsawat's *Miranda* waiver and subsequent statements are held to be "voluntary" under these overwhelming, traumatic, and extreme conditions, then the Fifth Amendment is clearly a dormant and useless phrase.

15. Mr. Ninsawat requests an evidentiary hearing and at the conclusion of the hearing, requests this Court find the *Miranda* waiver invalid and suppress all statements and their fruits. *Wong Sun v. United States*, 371 U.S. 471, 486 (1963).

16. The Assistant United States Attorney does not concur in the relief requested.

WHEREFORE Mr. Ninsawat respectfully requests that this Honorable Court hold a hearing, and after which suppress the Miranda waiver and all statements extracted by threats of force as involuntary, unreliable and/or inadmissible.

> Respectfully submitted,
>
> /s/ Jonathan M. Epstein
> Jonathan M. Epstein
> Attorney for Defendant
> 30445 Northwestern Hwy, Ste. 225
> Farmington Hills, MI 48067

Dated: January 20, 2023

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

UNITED STATES of AMERICA,

                Plaintiff

vs                                              Case No. 22-cr-20630
                                              Hon. David M. Lawson

NOPPHADON NINSAWAT,

_____Defendant/

## MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO VOID *MIRANDA* WAIVER AND SUPPRESS STATEMENTS

### I. Statement of Facts

Mr. Ninsawat is charged in an Indictment with eight counts related to the sexual exploitation of a minor, 18 USC 2251(a), 18 USC 2252A(a)(2), 18 USC 2242(b), et al. (R. 14; Indictment). The Indictment arises from an aggressive private solicitation of Mr. Ninsawat, a body builder who posts "physique shots," by a young woman (MV-1) who represented her age as eighteen (18) years. After Ninsawat "blocked her" on Snapchat and after MV-1's mother confiscated her cellphone, MV-1 obtained an old cellphone and pursued Ninsawat on Instagram, at various times, still misrepresenting her age. All conversations were private occurring over a three-week period in June of 2022.

At this time, Mr. Ninsawat was 31 years of age, owned his home on Ward, was a large mail machinery technician employed by Blue Crest Company, with no prior criminal record or contacts with law enforcement. He had been honorably discharged by the U.S. Army due to a disability being a collapsed lung and was under the care of the Veteran's Administration for the lung condition and other ailments. Mr. Ninsawat also regularly works out at a local gym and has done personal training. His mother Ms. Jeeranan Sturdy, who owns a Thai Restaurant "Gee's Thai" in Wyandotte, also lives with him in the Ward Street home.

At about 5:50 a.m., when still dark, on November 9, 2022, Mr. Ninsawat was in the

7

driveway of his home located in a quiet suburban "bedroom" community when he was confronted with multiple unmarked large para-military armored vehicles, lining the street, including a tank-like truck, and dozens of camouflaged officers in tactical military gear, para-military vests, helmets, body armor, AR-15 assault weapons which they pointed directly at him. The paramilitary-style armored vehicle had a very loud "loudspeaker" broadcasting a loop of instructions to come out with hands up, "police search warrant" and other loud commands which Ninsawat obeyed.

Mr. Ninsawat complied as he was "terrified" of the unfolding military operation. Indeed, in the U.S. Army he had experienced "simulated combat" at Fort Leonard, Missouri where he trained at night doing a "low crawl" while live rounds from assault weapons were fired above his head. As a result of his training, Mr. Ninsawat is well aware of the fatal damage an assault rifle can inflict on the body. (Affidavit to be provided).

At this time, Mr. Ninsawat, with assault weapons pointed at him, was hand-cuffed and placed on the curb of Ward Street while he observed armed para-military soldiers forcefully removing his mother, Ms. Jerranan Sturdy, a naturalized citizen, businesswoman and restaurant owner, from his home (from her bed) into the cold morning dressed only in a robe. He observed military officers had "smashed" his backpack and destroyed his laptop and work cell phone and observed soldiers kicking in doors, damaging and "ransacking his home" and possessions. Mr. Ninsawat was, at this time, in a complete state of shock and fear.

Following this display of extremely violent and coercive para-military action, shocking in the United States of America, Mr. Ninsawat was forcibly placed in an unmarked black Escalade and an armed paramilitary agent (Agent Alley) told him to sign a form and did as instructed[1]; this was a *Miranda* waiver which Ninsawat had no idea what it meant nor that he had

---

[1] The HSI Enforcement Operation Plan, as one of three "operational objectives" was for officers to "interview NINSAWAT, provide the opportunity for a polygraph…" and provided for use of "tactical dress" (Discovery Bates No. 0012 at pp. 1, 4).

8

a choice in the matter and indeed the individual rights are not explained nor initialed. In the midst of this inherently coercive scene, while frightened and confused, Mr. Ninsawat obeyed all commands and instructions while he was interrogated in the back seat of the Escalade for a period of time and answered questions and made incriminating statements.

Following the interrogation, Mr. Ninsawat was instructed to follow agents back to an unknown building where he was subjected to a polygraph examination where he made additional incriminating statements.

## II. Law and Argument

The Fifth Amendment's prohibition against coerced confessions rests upon a fundamental premise "'that ours is an accusatorial and not an inquisitorial system—a system in which the State must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth.'" *Arizona v. Fulminante*, 499 U.S. 279 (1991) (quoting *Rogers v. Richmond*, 365 U.S. 534, 540-41 (1961)).

A conviction may not rest upon an involuntary confession extracted by police through physical, or psychological, coercion. *Cooper v. Scroggy*, 845 F.2d 1385, 1390 (6th Cir. 1988). "A statement is involuntary if it is extracted by any sort of threats or violence [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence." *Hutto v. Ross*, 429 U.S. 28, 30 (1976) (quoting *Bram v. United States*, 168 U.S. 532, 542-43 (1897)).

The voluntariness of a confession must be judged by the "totality of the circumstances." *Fulminante, supra.* A two-prong test is used. A court must inquire as to (1) the conduct of law enforcement officials in creating pressure upon the suspect and (2) the individual's ability to resist this undue pressure. *Colorado v. Connelly*, 479 U.S. 157 (1986). Determination of whether a statement is involuntary "requires careful evaluation of all the circumstances of the interrogation." *Mincey v. Arizona*, 437 U.S. 385, 401 (1978). The question is "whether the defendant's will was overborne at the time he confessed." *Lynumn v. Illinois*, 372 U.S. 528, 534

9

(1963). In answering this question, the court should consider "the age, education, and intelligence of the defendant; whether the defendant has been informed of his *Miranda* rights; the length of the questioning; the repeated and prolonged nature of the questioning; and the use of physical punishment..." *McCalvin v. Yukins*, 444 F.3d 713, 719 (6th Cir. 2006) (emphasis added); *see also Withrow v. Williams*, 507 U.S. 680, 693–94 (1993).

Here, overwhelming and violent display by para-military officers in tactical gear causing damage and destruction created acute fear, confusion and pressure upon the suspect and was "terrifying"; "military-style" law enforcement activity in an otherwise "sleepy" civilian working-class community in Southgate, Michigan was simply overkill. While leaving for work, before sunrise, Mr. Ninsawat was suddenly confronted by an overwhelming para-military force of troopers, dressed in military-style fatigue, tactical vests and helmets, who exited large military-style transports with loudspeakers instructing him to comply, accompanied by a large tank-like battering ram vehicle, and officers armed with AR-15 automatic weapons were pointed at Mr. Ninsawat. He observed officers remove his mother, destroy his belongings and property and ransack his home.

As for Mr. Ninsawat's ability to resist this extreme pressure, he was relatively young, 31 years of age, with no prior experience or contacts with law enforcement. He was a responsible, working and cooperative citizen. He had been honorably discharged by the U.S. Army due to a collapsed lung condition and disability and was under the care of the Veteran's Administration for the condition and other ailments. Stressful events can leave him out of breath, winded or worse and require medical attention. Thus, he had no choice but to obey, follow commands and do as he was instructed by the soldiers including Agent Alley.

As for the "totality of the circumstances," the home on Ward is located in an otherwise quiet "bedroom" community wherein he was suddenly confronted with multiple unmarked large para-military vehicles, lining the street, including a tank-like truck, and dozens of camouflaged officers in tactical military gear, para-military vests, helmets, body armor, AR-15 assault weapons which were

10

pointed directly at him. Further, one paramilitary-style armored vehicle had a very loud "loudspeaker" broadcasting a loop of instructions to come out with hands up, "police search warrant" and other loud commands which he naturally obeyed.

In fact, Mr. Ninsawat immediately complied because he was "terrified" of the unfolding military operation. Indeed, in the U.S. Army he had experienced "simulated combat" at Fort Leonard, Missouri where he trained at night doing a "low crawl" while live rounds from assault weapons were fired above his head. As a result of his training, Mr. Ninsawat is well aware of the necessity to follow instructions under such conditions and the fatal damage an assault rifle can inflict on the body. (Affidavit to be provided).

1. Under these circumstances, Mr. Ninsawat was completely unaware of the nature and meaning of the form he signed in the black Escalade. That it was in fact a *Miranda* waiver, he had no understanding of what it was or that he had a choice of whether to sign it or not. The form was signed unknowingly and under extreme shock and duress and was not "knowing and voluntary." (as Ninsawat did not even understand what was happening) but was the product of force, threats of harm, and coercion. Counsel for Defendant asks would a guilty plea under such extreme conditions, with loudspeakers instructing compliance, AR-15s aimed at a defendant, while abusing his mother and destroying one's belongings along with threats be acceptable to the Court?

Mr. Ninsawat is entitled to a hearing in which both the underlying factual issues and the voluntariness of the waiver and confession are actually and reliably determined. *Sims v. Georgia*, 385 U.S. 538, 543-44 (1967); *Jackson v. Denno*, 378 U.S. 368, 376-77 (1964).

11

### III. Conclusion

For these reasons, due to the overwhelming force, violence and threats to Mr. Ninsawat, his mother and his home, the *Miranda* waiver was signed unknowingly, under duress, as a result of coercion and all statements should be suppressed.

Respectfully submitted,

/s/ Jonathan M. Epstein
Jonathan M. Epstein
Attorney for Defendant
30445 Northwestern Hwy, Ste. 225
Farmington Hills, MI 48067
Phone: 248-219-4004

Dated: January 20, 2023