UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,                  Case Number 22-20630

v.                                        Honorable David M. Lawson

NOPPHADON NINSAWAT,

                Defendant.

_____/

**OPINION AND ORDER ADJUDICATING DEFENDANT'S PRETRIAL MOTIONS**

Defendant Nopphadon Ninsawat, charged with production and receipt of child pornography and coercion or enticement of a minor to engage in sexual activity, has filed several motions attacking the indictment and the government's evidence.  Ninsawat asks the Court to dismiss counts of the indictment as multiplicitous, to dismiss the indictment entirely as describing his offenses that are beyond the authority of Congress to regulate under the Commerce Clause, to suppress the fruits of a search warrant executed at the defendant's residence, and to suppress statements made by the defendant during a streetside interrogation incident to the search warrant execution.  The Court held a hearing on March 16, 2023 at which the search warrant affiant and the defendant's mother (who was present when the search warrant was executed and the defendant was detained for questioning) testified.  After considering the evidence and having the benefit of the initial and supplemental briefs and the oral argument, the Court believes that Mr. Ninsawat is not entitled to the relief he seeks.  His motions, therefore, will be denied.

I.  Facts

A. Search Warrant Affidavit

On November 4, 2022, a warrant was issued by United States Magistrate Judge Elizabeth Stafford authorizing a search of the defendant's home in Southgate, Michigan, and the seizure of

all evidence or instrumentalities of crimes involving production or attempted production of child pornography, including computers and storage media, and evidence of the use, access to, and ownership of the same.  Search Warrant and Affidavit, Exhibit A, ECF No. 47-1.  The warrant affidavit was executed by Homeland Security Agent David Alley.  Alley stated that he was investigating suspected production, attempted production, receipt, and possession of child pornography by defendant Nopphadon Ninsawat.

Alley reported that in June 2022, the mother of "MV-1," a minor, reported to police that her 15-year-old daughter had been engaged in sexually explicit conversations with a 31-year-old adult male identified as Ninsawat.  During interviews with police, MV-1's mother provided the daughter's cell phone and gave consent for a search of its contents.  The examination of MV-1's phone disclosed Instagram chats in which MV-1 referred to Ninsawat by name and where he supplied his cell phone number.  The affidavit also stated that during a "Kids Talk" interview, MV-1 said that she met Ninsawat first on SnapChat, that she had sent him pictures of her "breast, butt, and vagina," and that "it happened more than once."  Alley attested that among other things, the conversations via Instagram showed that "Nopphadon Ninsawat, is aware of this child's age, has sent images of his penis to this child, and has requested and received sexually explicit images via disappearing messages."

According to Instagram's online user manual, the application offers a feature known as "Vanish Mode" in which messages are automatically deleted shortly after they are received and viewed.  *See* Instagram Features: Send Messages in Vanish Mode, https://tinyurl.com/5ett5vrh ("Vanish mode lets people send each other disappearing messages, photos, videos and other content in Instagram chats.  Content sent in vanish mode disappears when someone leaves the chat or turns vanish mode off.").

The affidavit recited Alley's experience in computer forensic analysis and also supplied background information about the use and features of computer and cell phone communications, as well as the SnapChat and Instagram social media platforms through which defendant and MV-1 had communicated. Alley also recited user account and cell phone identifiers associated with Ninsawat, which had been provided to investigators by MV-1's mother and confirmed through examination of MV-1's phone.

Alley also attested that he was given consent by MV-1's mother to search MV-1's Instagram account information. He included lengthy excerpts of conversations between MV-1 and Ninsawat in which MV-1 disclosed that she was a minor (15 years old), *id.* at PageID.269, 273; and where MV-1 discussed how her mother had seen conversations where MV-1 sent the defendant "my cooch and tit pics," PageID.272. *See* Instagram Transcript dated June 4-5, 2022, PageID.269-273, 274. On June 5, 2022, Ninsawat provided his phone number to MV-1, sent her a picture of his erect penis, and said that he was "hard" because he had looked at an "old pic" MV-1 had sent him of her "coochie." *Id.* at PageID.275-76. On the same date, MV-1 asked Ninsawat to delete her old pictures because they were "child porn," and Ninsawat responded, "There was [sic] 48 pictures." *Id.* at PageID.277. MV-1 also said, "I didn't want you to ss them," referring to her explicit images, and Ninsawat replied, "Well I did that so I can look at them later and I didn't have to ask you so much." *Id.* at PageID.277-28. Alley attested based on his training and experience that the abbreviation "ss" refers to "screenshotting" or capturing and saving a copy of an image displayed on the screen of a device like a cell phone or computer.

On June 6, 2022, MV-1 sent a photo which, according to Alley, "appears to be a close up of a female wearing a bra," which was followed by an image sent via disappearing message. *Id.* at PageID.278. On June 7, 2022, MV-1 and Ninsawat engaged in an explicit conversation where

MV-1 asked Ninsawat to send pictures of his penis, and he responded by sending numerous images via disappearing messages.  *Id.* at PageID.278-280.  Ninsawat then wrote, "Let me see your pussy real quick baby," and MV-1 sends a disappearing message in return.  Ninsawat responded, "Uhhh idk," and "Maybe if you play with it and moan a lik [sic]."  *Id.* at PageID.280.  On June 8, 2022, the two engage in another extended conversation where Ninsawat sends pictures of his penis, asks MV-1 to send pictures of her pussy, and MV-1 responds with additional disappearing messages. *Id.* at PageID.281-84.  A similar explicit exchange and image trading session transpired again on June 20, 2022.  *Id.* at PageID.287-289.

Alley attested that on September 9, 2022, he received a subpoena return from Metro PCS for subscriber data relating to a cell phone number provided by Ninsawat to MV-1 during their internet chats, and also identified by MV-1's mother as belonging to Ninsawat.  The provider responded with data showing that the number was registered to Ninsawat.

Alley also subpoenaed and received account ownership data from Instagram, SnapChat, and Comcast indicating that accounts suspected to have been used by Ninsawat were accessed from a network address traced to his residence.  *Id.* at PageID.290-92.  On several dates between September 15, 2022 and October 25, 2022, Alley and other agents observed a vehicle registered to Ninsawat parked in the driveway of the residence or in the vicinity driving to or from the address.  *Id.* at PageID.293.

Ninsawat contends that the government never recovered any images from his own devices or from any internet accounts used by him that comprise child pornography.  However, as noted above, the defendant and MV-1 extensively used the "disappearing message" feature of Instagram, which is advertised as automatically deleting message contents shortly after messages are sent or received.

## B. Interrogation

The search warrant was executed at Ninsawat's residence on November 9, 2022 around 6:00 a.m.  Ninsawat was outside the home walking to his car when the agents arrived.   He was handcuffed and taken to a government vehicle (a Ford Expedition) and put in the back seat.  Ninsawat was compliant, according to Alley's hearing testimony, and the handcuffs were then removed.  Alley and his partner, Laura Trainer, were present.  They started an audio recording and began reading Ninsawat his *Miranda* rights.

Alley testified that Ninsawat eventually agreed to submit to a polygraph examination, and Alley drove him to the agency office after the back-seat interrogation.

The government submitted several audio clips of interrogations that occurred while the search warrant was being executed.  The clips consist of audio only without video.  The clips do not evidence any substantive statements made by the defendant but only capture the interactions between government agents and the defendant during the advice and waiver of rights.

In the government's Exhibit B, Clip 1, a male interrogator, identified by the government as Agent Alley, is reading *Miranda* rights to the defendant.  Some ambient noise is heard on the recording consistent with the defendant's assertion that the event occurred inside a government vehicle at the scene of the search.  The time is identified as 6:20 a.m. on November 9, 2022.  Alley indicates that his partner, Agent Trainer, also is present.  Alley begins by telling the defendant: "[R]ight now we are executing a search warrant at your address, ok.  I'd like to talk to you, sort of ask you some questions, figure out everything that is going on here today, um, you're not under arrest, you're not under arrest right now, we're just talking, ok.  That said, I want you to know what your rights are before we start talking.  Um, and feel free to stop me at any time if you have any questions."  Alley then proceeds to read from the advice of rights form, and at the end says, "So knowing all of that, are you willing to talk to me and figure out what's going on here today?"

The defendant responds, "Yeah, yeah, I'd like to know what's going on, yeah sure."  Ninsawat then is directed to sign and initial the advice of rights form.  The tone is calm and business like throughout and there are no indications that Ninsawat is agitated or afraid.

In the government's Exhibit B, Clip 2, Ninsawat is heard speaking calmly with Agent Alley.  Alley says, "You mentioned your Instagram name, you mentioned your Snapchat name, is there a reason you think I might have asked you about those?"  After a long pause, Ninsawat calmly answers, "I don't know, maybe you wanted to follow me?"

In the government's Exhibit C, Clip 1, Ninsawat is heard talking with a female interrogator identified as Homeland Security Agent Allison Haimila.  The location is identified as the office of Homeland Security Investigations in Detroit, and the time is 8:15 a.m. on November 9, 2022.  Agent Haimila tells Ninsawat that the interview is being audio recorded, and she offers him water and nuts, which she provided for the interview.  Ninsawat engages in a jocular exchange with Agent Haimila asking, "Am I going to be brainwashed," laughing as he asks the question.  Haimila responds, "I wish," and "that would be a great superpower."  Ninsawat then says, "This is going to feel like a nightmare," and Haimila says, "I can understand that," and then adds, "This is starting to feel like a nightmare if I get one more pen that doesn't work."  Ninsawat then asks, inexplicably, "Are you going to give me a birthday present," to which Haimila responds, "I don't even give my kids birthday presents."  The interview then resumes a businesslike track with Haimila repeating the advice about being audio recorded.

In the government's Exhibit C, Clip 2, the defendant again is heard conversing in a normal manner with Agent Haimila.  Haimila says they are going to review an advice of rights form; she says that she will read "the top part," Ninsawat will read "the bottom part," and "then we'll sign it."  The agent reads the recitation of *Miranda* rights, Ninsawat then reads the recital of his

understanding and intent to answer questions without a lawyer present, and when asked if he understands what it says, he answers, "Yes." He then is directed to sign the form, which apparently he does. The interrogator then reads an advice form concerning participation in a polygraph examination, and Ninsawat states that he understands and agrees to submit to a polygraph examination. Ninsawat is asked about his age and answers that he is 31 years old. In response to further questions, Ninsawat says that he was born in Bangkok, Thailand, and he answers questions about his demographic and personally identifying information. The interrogator then elicits some information about Ninsawat's medical history and where has lived in the U.S. including in Michigan and Missouri. Ninsawat states that he has lived in Southeast Michigan for around nine years. Ninsawat indicates that he occasionally has "breathing problems" relating to "lung collapse," but he has been treated medically for the condition and is able to resolve it by changing position and moving around as prescribed. Ninsawat states that he has not taken any drugs or alcohol within 24 hours. He says that he is feeling "a little pain" evidently in his wrist or forearm that he described as "nerve pain" and rated subjectively as a "3" on a scale of 1-10. He states that the pain started "after he got vaccinated." Ninsawat says that he slept for six hours the prior night, woke up at 5:30 a.m., and had a "protein shake" in the morning after he awoke, which was a typical morning meal for him. Ninsawat finally stated that when he was stationed with the Army in Missouri, he went to talk to a counselor "a few times" in 2012 because he was "depressed."

In the government's Exhibit C, Clip 3, Ninsawat again is heard speaking calmly with Agent Haimila. When asked about his educational level and military enlistment, he states that he graduated high school in 2010, enlisted in the U.S. Army in 2012, and completed a two-year program of study after high school at a "technical school" training in "heating and cooling" or "HVAC" maintenance.

## C. Proceedings

On November 22, 2022, the defendant was charged in an eight-count indictment with various crimes of child pornography and enticement of a minor.  In Counts I, II and III, defendant is charged with sexual exploitation of children, 18 U.S.C. § 2251(a), (e), coercion and enticement, 18 U.S.C. § 2422(b), and receipt of child pornography, 18 U.S.C. § 2252A(a)(2), (b)(1), all arising from events on June 8, 2022.  In counts IV and V, the defendant is charged with attempted sexual exploitation and attempted coercion or enticement arising from events on June 9, 2022.  In Counts VI, VII, and VIII, the defendant is charged with sexual exploitation of children, coercion and enticement, and receipt of child pornography, arising from events on June 20, 2022.

## II. Motion to Dismiss Counts Due to Multiplicity

In this motion, the defendant argues that the various counts in the indictment are multiplicitous because they all arise from a "single continuous conversation" that transpired over 12 days in June 2022, and because the "enticement" and "production" and "receipt" crimes all involve the same alleged conversations and images.  The government resists that motion by asserting that conduct occurring on separate dates and conduct on the same date involving the production of multiple images can give rise to separate counts for each date and each image, and the elements of the crimes charged in the separate counts do not overlap: "production" of child pornography and "coercion or enticement" do not involve any element comprising the knowing "receipt" of pornography, which is a required element in a conviction for "receipt."  The government has the better argument.

"Multiplicity occurs when a defendant is charged for 'a single offense in more than one count in an indictment.'"  *United States v. Carter*, No. 22-5300, 2023 WL 2446140, at *2 (6th Cir. Mar. 10, 2023) (quoting *United States v. Myers*, 854 F.3d 341, 355 (6th Cir. 2017)).  To determine whether the crimes charged in several counts are actually a "single offence," courts use an

- 8 -

elemental approach outlined in *Blockburger v. United States*, 284 U.S. 299, 304 (1932).  The question is "'whether each charge requires proof of a fact that the other charge does not; if each charge does, then the charges accuse different crimes and are therefore not multiplicitous.'" *United States v. Montgomery*, No. 20-5891, 2022 WL 2284387, at *12 (6th Cir. June 23, 2022) (quoting *United States v. Myers*, 854 F.3d 341, 355 (6th Cir. 2017)).

The defendant has failed to show that the charges are multiplicitous.  First, he has cited no legal authority for the novel proposition that conduct occurring on separate dates cannot give rise to multiple charges.  Moreover, his position that the interactions of the defendant and MV-1 over the course of 12 days constituted a "single continuous conversation" without interlude or interruption, although novel, is fanciful.  Second, it has been widely held that separate charges based on multiple images are not multiplicitous in a child pornography prosecution.  *E.g.*, *United States v. England*, No. 21-5273, 2023 WL 1777533, at *11 (6th Cir. Feb. 6, 2023) (affirming denial of motion to dismiss for multiplicity where several counts for receipt and one count for possession of child pornography were based on receipt of multiple distinct images and possession of a collection of other images).

More to the point, the proper inquiry is not whether the charges are based on the same acts or evidence but whether the crimes charged require the government to prove mutually exclusive elements in order to secure multiple convictions.  *See United States v. Montgomery*, No. 20-5891, 2022 WL 2284387, at *12 (6th Cir. June 23, 2022) ("The two convictions at issue here are based on a single monetary transaction . . . . But the question is not whether the charges are based on the same conduct, but whether the charges each require proof of an element the other does not.")  In this case, there are distinct elements for each of the crimes charged.

"The elements of coercion and enticement of a minor are that (1) defendant used a facility or means of interstate commerce in an attempt to knowingly persuade, induce, entice, or coerce an individual under the age of eighteen to engage in sexual activity; (2) defendant believed the person was under eighteen; and (3) that if sexual activity had occurred, the defendant could have been charged with a criminal offense under state law." *United States v. Johnson*, 775 F. App'x 794, 797 (6th Cir. 2019) (citing 18 U.S.C. § 2422(b); *United States v. Roman*, 795 F.3d 511, 515-16 (6th Cir. 2015)).

"The elements of receipt [of child pornography] under § 2252(a)(2) require that a person 'knowingly receive[s], or distribute[s], any visual depiction' of a minor engaging in sexually explicit conduct. Section 2252(a)(2) also requires an interstate commerce nexus, which may be satisfied by showing either (1) that the defendant received the visual depiction 'using any means or facility of interstate or foreign commerce'; or (2) that the visual depiction is one 'that has been mailed, or has been shipped or transported in or affecting interstate or foreign commerce, or which contains materials which have been mailed or so shipped or transported, by any means including by computer.'" *United States v. Blessett*, No. 19-10328, 2022 WL 1078096, at *2 (9th Cir. Apr. 11, 2022) (quoting 18 U.S.C. § 2252(a)(2)).

The elements of "sexual exploitation of children" under 18 U.S.C. § 2251(a) were examined by the Sixth Circuit in *United States v. Frei*, 995 F.3d 561 (6th Cir. 2021). "A defendant violates § 2251(a) if he 'employs, uses, persuades, induces, entices, or coerces any minor to engage in . . . any sexually explicit conduct for the purpose of producing any visual depiction of such conduct.'" *Id.* at 566 (quoting 18 U.S.C. § 2251(a)). The defendant also must know that the depiction was or would be produced or transmitted using a facility of interstate commerce. *See* Sixth Circuit Pattern Criminal Instr. 16.01. Proof of the crime of sexual exploitation does not

require "the defendant to sexually engage with the minor for the sole purpose of producing visual depictions," but it is a "specific-intent crime, which requires that the defendant must purposefully or intentionally commit the act that violates the law and do so intending to violate the law." *Frei*, 995 F.3d at 566 (citing *United States v. Ramamoorthy*, 949 F.3d 955, 961 (6th Cir. 2020)).

Looking at the individual charges set out in the indictment, conviction for coercion or enticement requires the government to prove that the defendant 'enticed' or 'coerced' a minor to engage in sexual activity; no such proof is required for receipt of child pornography. Coercion or enticement also requires the government to prove that, if sexual activity had ensued, it would have been illegal under state law; also an element not required for proof of receipt of child pornography. Receipt of child pornography, on the other hand, requires that the government prove that the defendant "received" by way of interstate facilities "images" depicting a minor engaged in sexually explicit conduct. Conviction for coercion or enticement does not require proof of receipt of child pornographic images via interstate facilities. The congruent analysis applies to the elements of "sexual exploitation of children" vs. receipt of child pornography.

The government concedes that the question is closer as between the elements of "sexual exploitation of children" under section 2422(b) and "coercion or enticement" under section 2251(a). However, it has been held that these offenses are not multiplicitous because there is not a complete identity of elements between them. *United States v. Isabella*, 918 F.3d 816, 848 (10th Cir. 2019) ("Section 2422(b) requires proof that the defendant 'knowingly persuades, induces, entices, or coerces any individual who has not attained the age of 18 years.' Section 2251(a) and (e) requires proof that the defendant 'employs, uses, persuades, induces, entices, or coerces.' Because § 2422(b) does not include the words 'employs' or 'uses,' this element of § 2251(a) and (e) is broader than the corresponding element in § 2422(b), and therefore the former cannot be a

- 11 -

lesser included offense of the latter.").  Each crime, therefore, requires proof of elements that the other does not.  The charges are not multiplicitous.

Moreover, as the government points out, "[t]here is no inflexible rule that the exclusive remedy for multiplicitous counts is election between them.  Requiring election is one option, but not the only option; the court may, for example, simply vacate both the conviction and the sentence as to all but one count, essentially merging the offending counts." *United States v. Pires*, 642 F.3d 1, 16 (1st Cir. 2011) (citing *Ball v. United States*, 470 U.S. 856, 864 (1985)).  "This flexible approach makes good sense because the Double Jeopardy Clause does not protect against simultaneous prosecutions for the same offense, so long as no more than one punishment is eventually imposed." *Ibid.* (quotation omitted).  If it is determined at or after trial that two or more of the resulting convictions violate the Double Jeopardy Clause, then appropriate relief may be granted at the sentencing phase of the case.

The defendant's motion to dismiss certain counts of the indictment based on multiplicity will be denied for now.

### III. Motion to Dismiss for Lack of Interstate Nexus

The defendant argues that the communications in this case were "purely intrastate" in that they involved two persons both situated in Michigan, and that because the images in question were automatically deleted, they could not be shared or distributed through interstate commerce after they were transmitted.  He contends that regulation of purely "private" and "intrastate" production and exchange of child pornography is beyond the power of Congress to regulate under the Commerce Clause because it has no involvement in "interstate commerce."  However, this collides with binding Sixth Circuit precedent: *United States v. Bowers*, 594 F.3d 522, 528 (6th Cir. 2010). The defendant's efforts to undermine this precedent with later decisions are unpersuasive.

Congress's power to regulate — and prohibit — the distribution of child pornography and the enticement of minors to engage in sexual activity is sourced in the Commerce Clause, which states that "Congress shall have the power . . . to regulate Commerce with foreign Nations, and among the several States . . . ."  U.S. Const. art. I § 8 cl. 3.  The defendant does not contest the federal regulation of child pornography distribution generally, and it is well established that those criminal statutes are facially constitutional.  *See United States v. Chambers*, 441 F.3d 438, 451 (6th Cir. 2006).  But in *Bowers*, the court of appeals, citing established Supreme Court precedent, reaffirmed the rule that the federal child pornography statutes' reach encompasses purely local activity.   "In *Raich,* the Supreme Court reemphasized that 'case law firmly establishes Congress'[s] power to regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce.'"  594 F.3d at 527-28 (quoting *Gonzales v. Raich*, 545 U.S. 1, 17 (2005); citing *Wickard v. Filburn,* 317 U.S. 111, 128-29 (1942)).

The *Bowers* court also put to rest the idea that the regulated activity must itself have a commercial aspect.  "The Court further indicated that, as *Wickard* established, 'Congress can regulate purely intrastate activity that is not itself 'commercial,' in that it is not produced for sale, if it concludes that failure to regulate that class of activity would undercut the regulation of the interstate market in that commodity.'" *Id.* at 528 (quoting *Raich*, 545 U.S. at 18).

Finally, addressing the local activity of an individual defendant, the court reiterated that "[w]hen the larger 'general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence.'"  *Ibid.* (quoting *Raich*, 545 U.S. at 18).

Applying these fundaments, the *Bowers* court affirmed the conviction of a defendant for sexual exploitation of a child in the manufacture of child pornography and possession of child

- 13 -

pornography where the facts supporting the conviction disclosed purely local activity. Government agents discovered the defendant's photograph album, which contained images of his teenage daughter and her friends that were taken over a two-year period when they had been at his house for sleepovers. The photos depicted the girls in sexual poses that the defendant staged while they were sleeping. There was no evidence that the defendant distributed the photographs, posted them online, tried to sell them, or took them out of the state. 594 F.3d at 524-25. The court of appeals rejected the defendant's as-applied constitutional challenge to his convictions, which was phrased in similar terms to Ninsawat's contentions in this case. Addressing the argument that the conduct was purely local, the court held, "The fact that the Government did not prove Bowers's individual conduct substantially affected interstate commerce is irrelevant. Bowers's as-applied challenge must fail." 594 F.3d at 529. And the court discounted the notion that a defendant is entitled to a case-by-case analysis to determine an interstate nexus "where Congress has the federal power to regulate a class of activities"; in those circumstances, "'the courts have no power to excise, as trivial, individual instances of the class,' and the '*de minimis* character of individual instances arising under that statute is of no consequence.'" *Ibid.* (quoting *Raich*, 545 U.S. at 23, 17).

Ninsawat cites decisions from 2014 and 2018 purportedly calling *Bowers* into question, namely *Bond v. United States*, 572 U.S. 844 (2014), and *United States v. Nagarwala*, No. 17-20274 (E.D. Mich. Nov. 20, 2018). He also cites *United States v. Rife*, 33 F.4th 838 (6th Cir. 2022). But the central holding of *Bowers* was reaffirmed in *United States v. Clark*, 24 F.4th 565 (6th Cir. 2022), where the Sixth Circuit held that the use of any internet communication service to transmit messages suffices to satisfy the interstate commerce nexus, regardless of the location of sender and receiver of the messages. *Clark* is directly on point in concluding that the defendant's

"argument that his child pornography did not pass through interstate wires — though dubious considering the structure, complexity, and interconnectedness of the internet — is [] inconsequential," because "[b]y its terms, § 2252(a)(2) can reach a purely intrastate distribution of child pornography so long as that distribution occurred by the use of a means or facility of interstate commerce," and "[o]ther circuit courts have reached the same conclusion when interpreting identical language in substantially similar statutes," 24 F.4th at 574.

The lone decision following *Clark* that the defendant has cited is *United States v. Rife*, 33 F.4th 838 (6th Cir. 2022). That case did not even mention — let alone repudiate — either *Bowers* or *Clark*. Moreover, it is distinguishable because it held that regulation of sexual misconduct with a minor in a foreign country was beyond the power of Congress to regulate under the foreign commerce language in the Commerce Clause, U.S. Const. art. I, § 8, cl. 3 ("The Congress shall have Power . . . To regulate Commerce with foreign Nations . . ."). Instead, citing *Missouri v. Holland*, 252 U.S. 416 (1920), the court of appeals upheld the conviction under the child enticement statute, holding that Congress had the authority to regulate such extraterritorial conduct under the Treaty Clause, Art. II, § 2, cl. 2, and the Necessary and Proper Clause, Art. I, § 8, cl. 18. *Rife*, 33 F.4th at 848.

The defendant also relies on *Bond v. United States*, 572 U.S. 844 (2014), where the Supreme Count invalidated a conviction the Chemical Weapons Convention Implementation Act, where the defendant, a "jilted wife," had engaged in "an amateur attempt . . . to injure her husband's lover, which ended up causing only a minor [chemical] thumb burn readily treated by rinsing with water." *Id.* at 848. Although the Court acknowledged that Treaty Clause and the Necessary and Proper Clause, when "[r]ead together . . . empower Congress to pass laws necessary and proper for carrying into execution the power to make Treaties," *Id.* at 874-75 (Scalia, J.,

concurring) (cleaned up), the Court held that the statute did not reach "a purely local crime." *Id.*
at 848.   But nothing said in *Bond* or *Rife* implicates the scope of the (domestic) Interstate
Commerce Clause authority underpinning *Bowers* and *Clark*, *see* Art. I, § 8, cl. 3 ("The Congress
shall have Power . . . To regulate Commerce . . . among the several States.").

Ninsawat's Commerce Clause challenge to the charges is foreclosed by *United States v.*
*Bowers*.

Further, and squarely on point following *Bowers*, the use of a device manufactured abroad
(such as a cell phone) also has been held to establish the interstate commerce nexus.  *E.g.*, *United*
*States v. Napier*, 787 F.3d 333, 346 (6th Cir. 2015) ("At trial, the government also presented
evidence that some, if not all, of the Victim 2 videos that Napier emailed were taken using a
cellphone whose label indicated it was made in Taiwan.  Courts have held that the use of materials
manufactured outside of the United States is sufficient to establish an interstate nexus."); *see also*
*ibid.* ("Napier argued during closing, and argues again on appeal, that the government must prove
where the recipient of any particular email was physically located when the email transmission
was received.  This is not the relevant inquiry.  The relevant inquiry is whether there is enough
circumstantial evidence that these electronic communications were transmitted through interstate
wires. Given the omnipresent nature of the Internet, this is not a difficult burden for the government
to satisfy.") (collecting cases).

Ninsawat also argues at length about the use of "disappearing messages," apparently
suggesting that the "pornographic nature" of the images cannot be proved because no images
presently exist and none were recovered during the investigation.  However, the circumstantial
evidence of the conversations describing the images, and, presumably, MV-1's own testimony,
would be sufficient to establish that images did exist, and were sent, and that they were

pornographic in content.  The testimony of a victim witness has been held to establish the nature of depictions even where no such depictions were exhibited to the jury.  *Maupin v. Garcia*, No. 036051, 2005 WL 1367066, at *9-10 (E.D. Cal. May 23, 2005), *R&R adopted*, 2005 WL 1875651 (E.D. Cal. Aug. 4, 2005) ("[T]he evidence was sufficient for the jury to infer that the videos appellant showed the victims contained 'harmful matter.'  Each of the victims testified that appellant had shown them movies.  Patricia identified the movies as 'nasty' and described them as depicting naked people lying in bed touching and rubbing each other's 'privates.'  In addition they were rubbing 'each others [sic] privates against each other.' . . . . Jessica described watching 'nasty videos' with appellant.  The movies showed naked boys and girls having sex on the porch. . . . Although the jury never saw the actual movies appellant showed the victims, their testimony was sufficient to allow the jury to infer that the films depicted explicit acts of sexual intercourse and sodomy.").  As a general matter, it is also well settled that "the testimony of a single, uncorroborated prosecuting witness or other eyewitness is generally sufficient to support a conviction, so long as the prosecution presents evidence which establishes the elements of the offense beyond a reasonable doubt."  *Evans v. Tanner*, No. 19-11660, 2023 WL 1994325, at *6 (E.D. Mich. Feb. 14, 2023) (citing *Brown v. Davis*, 752 F.2d 1142, 1144-45 (6th Cir. 1985)).  There is no reason to conclude at this stage that the government will be unable to meet its burden of proof at trial based on the record so far presented.

The defendant's motion to dismiss the indictment for lack of an interstate nexus will be denied.

### IV.  Motion to Suppress Evidence and for a *Franks* Hearing

Ninsawat argues that all the evidence seized during the execution of the search warrant must be suppressed because the supporting affidavit is defective.  He contends that the affidavit

contained material misrepresentations including (1) the failure to explain explicitly that "disappearing messages" automatically would be deleted by Instagram's "Vanish Mode" feature, meaning that no images sent by such a feature likely would be found, (2) the failure to disclose that the entire transcript of the defendant's conversations with MV-1 already had been obtained by the government through a warrant to search Ninsawat's Instagram account, which yielded no explicit images, and (3) the failure to disclose that there was no evidence uncovered that suggested the involvement of the defendant with any "other children" besides MV-1. The government disagrees.

"The Fourth Amendment protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *Liberty Coins, LLC v. Goodman*, 880 F.3d 274, 280 (6th Cir. 2018) (quoting U.S. Const. amend. IV). Thus, "[a] search is generally unreasonable if it is not conducted pursuant to a warrant issued upon probable cause." *Ibid.* (citing *Camara v. Municipal Court of City & County of San Francisco*, 387 U.S. 523, 528-29 (1967)). "Probable cause exists if 'the facts and circumstances are such that a reasonably prudent person would be warranted in believing that an offense had been committed and that evidence thereof would be found [within the place or device] to be searched.'" *Peffer v. Stephens*, 880 F.3d 256, 263 (6th Cir. 2018) (quoting *Greene v. Reeves*, 80 F.3d 1101, 1106 (6th Cir. 1996)). But false facts cannot be considered when assessing probable cause. Under *Franks v. Delaware*, if the defendant shows by a preponderance of evidence that a search warrant affiant committed perjury or made a statement in reckless disregard for the truth, the offending statements must be excised from the affidavit and probable cause reassessed. *Franks*, 438 U.S. at 155-56.

To be entitled to a *Franks* hearing, the defendant must "1) make[] a substantial preliminary showing that the affiant knowingly and intentionally, or with reckless disregard for the truth,

included a false statement or material omission in the affidavit; and 2) prove[] that the false statement or material omission is necessary to the probable cause finding in the affidavit." *United States v. Young*, 847 F.3d 328, 348-49 (6th Cir. 2017)).  "To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine.  There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." *Franks*, 438 U.S. at 171.  The Sixth Circuit has characterized this as "a heavy burden." *United States v. Bateman*, 945 F.3d 997, 1008 (6th Cir. 2019).

"*Franks* also extends to circumstances in which an officer omits evidence in a search-warrant affidavit that is critical to determining the existence of probable cause." *United States v. Duval*, 742 F.3d 246, 251 (6th Cir. 2014) (citation omitted); *see also United States v. Carpenter*, 360 F.3d 591, 596 (6th Cir. 2004) (*en banc*) ("[T]his court has recognized that material omissions [from an affidavit] are not immune from inquiry under *Franks*.") (second alteration in original and internal quotation marks omitted).  "[T]o be constitutionally problematic, the material must have been deliberately or recklessly omitted and must have undermined the showing of probable cause." *Carpenter*, 360 F.3d at 596-97.

The search warrant affidavit in this case sets forth ample facts that establish probable cause to support a reasonable expectation that child pornographic images would be discovered on the defendant's electronic devices, notwithstanding the fact that the search when executed ultimately proved unfruitful.  The defendant apparently contends that because no images exist, the warrant application was deceptive in suggesting that images might be found.  But he has cited no authority for the proposition that a search is invalid merely because it proves unproductive.

First, there is ample information linking the defendant personally with his cell phone, internet address, and residence address.  The defendant identified himself by name and phone number in incriminating conversations with MV-1.  He repeatedly requested explicit images, and MV-1 responded by sending messages that, from the ensuing discussion, circumstantially could be found to have contained explicit images.  He also plainly stated that he had preserved and stored on his cell phone at least 48 explicit images of MV-1 which he viewed later to become aroused.  All of those facts amply justify a fair inference that images might be discovered on one or more of the defendant's devices.

The absence of elaboration about the "disappearing messages" feature — which is readily understandable on its face by any magistrate reasonably familiar with the meaning of the words "message" and "disappear" that are contained in the affidavit — is inconsequential in light of the information suggesting plainly that the defendant had preserved the content of such messages by other means, namely screenshots.  The omission of discussion about a prior search of the Instagram account was not deceptive because it is unsurprising that no images would be found during such a search in light of the extensive use of the automatic deletion feature of the platform during the incriminating exchanges.  It is well settled that in order to justify a *Franks* hearing, the defendant must "prove[] that the false statement or material omission is necessary to the probable cause finding in the affidavit," *Young*, 847 F.3d at 348-49, and he has not so proven here, because none of the facts alluded to in the present motion are "necessary" to the probable cause finding.

Because there is no defect in the search warrant affidavit, the motion to suppress evidence and for a *Franks* hearing will be denied.

V.  Motion to Suppress Statements

The evidence presented in the government's exhibits and at the evidentiary hearing plainly show that the defendant was given his *Miranda* warnings and that he waived his right to remain silent and to consult an attorney before talking to government agents.  Ninsawat argues, however, that those waivers themselves were involuntary.  He says that the circumstances of the interrogation were overwhelmingly coercive due to (1) the presence of numerous agents dressed in tactical gear and armed with assault rifles, (2) the invasive and physically disruptive search of the home, (3) the deployment of the search team in "military style vehicles," (4) the roadside questioning during the search execution, following a perfunctory advice of rights, and (5) the defendant's past experience in military training which left him "traumatized" and terrified of the heavy force displayed.

The iconic *Miranda* warnings that must precede police questioning of a person in custody have become embedded in our legal culture for nearly five decades.  *Dickerson v. United States*, 530 U.S. 428, 443 (2000) ("*Miranda* has become embedded in routine police practice to the point where the warnings have become part of our national culture.").  Police interrogators must tell a suspect about his right not to incriminate himself, and that if he gives up his right to remain silent, his statements can be used against him in court.  *Miranda v. Arizona*, 384 U.S. 436, 497 (1966).  He must be told that he has a right to a lawyer to advise him and that one will be furnished if he cannot afford one.  *Ibid.*  All of this must be explained to the suspect before any questioning can take place.  *Berghuis v. Thompkins*, 560 U.S. 370, 380 (2010).  And the suspect must "voluntarily, knowingly and intelligently" waive these rights, or else any statements made in response to police questioning "must be suppressed."  *United States v. Al-Cholan*, 610 F.3d 945, 954 (6th Cir. 2010) (quoting *Colorado v. Spring*, 479 U.S. 564, 572 (1987)).

- 21 -

In a case where the defendant does not claim that government agents failed to advise him properly of his rights, but instead says that his written and verbal waivers were not knowing, voluntary, or intelligent, then "[t]he test for whether a *Miranda* waiver is voluntary is essentially the same as the test for whether a confession is voluntary." *United States v. Binford*, 818 F.3d 261, 271 (6th Cir. 2016) (quotation omitted).  That waiver analysis "'has two distinct dimensions.'" *United States v. Abdi*, 827 F. Appx 499, 507 (6th Cir. 2020) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).  Such a waiver is voluntary "when 'it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.'" *United States v. Fein*, 843 F. Appx 765, 770 (6th Cir. 2021) (quoting *Moran*, 475 U.S. at 421).  "It is knowing and intelligent when it is made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Ibid.* (quotation marks omitted).

When a defendant asserts that a waiver of his rights was involuntary due to police coercion, the Court must find that three criteria are satisfied before excluding a post-waiver custodial statement: "(1) the police activity was 'objectively coercive'; (2) the coercion in question was 'sufficient to overbear defendant's will'; and (3) the alleged police misconduct 'was the crucial motivating factor in the defendant's decision to offer the statements.'" *Abdi*, 827 F. Appx at 507 (quoting *United States v. Luck*, 852 F.3d 615, 622 (6th Cir. 2017); *United States v. Binford*, 818 F.3d 261, 271 (6th Cir. 2016)).  The Supreme Court has held that, regardless of the defendant's subjective mental status when he was interrogated, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary'" and therefore must be suppressed. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).

When evaluating voluntariness under this standard, the Court considers "'the totality of the circumstances' to determine whether 'a defendant's will was overborne in a particular case.'"

*United States v. Craft*, 495 F.3d 259, 263 (6th Cir. 2007) (quoting *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994)).  "Relevant factors include the defendant's age, his level of education and intelligence, whether he was advised of his rights, whether he suffered physical punishment and the length of the questioning he endured." *Ibid.* (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)).  These factors are viewed "primarily from the perspective of the police, such that where the police had no reason to believe that the defendant misunderstood the warnings, there is no basis for invalidating the *Miranda* waiver." *United States v. Ramamoorthy*, 949 F.3d 955, 965 (6th Cir. 2020) (quoting *United States v. Al-Cholan*, 610 F.3d 945, 954 (6th Cir. 2010) (quotation marks and alterations omitted)).

The evidence that the defendant has presented does not support his contentions about his allegedly fragile state of mind at the time of the interrogation.  Even if his alleged mental state could be substantiated, it is not dispositive on the question of voluntariness of his confession where the evidence presented at the hearing and the available records of the interrogation disclose no coercive conduct by the interrogators.  There is no question that the government agents presented a show of force when they arrived at the defendant's house to execute the search warrant.  They arrived in multiple vehicles and in tactical gear.  They brandished their weapons.  The defendant's mother was forced outside in her bathrobe, where she apparently remained until the search was concluded.  The door of her bedroom was forcibly breached.  A backpack was damaged by an agent. The defendant was handcuffed temporarily.  But there is nothing in the record that supports the idea that the defendant's will was overborn by this show of force.

For instance, there is nothing in the interview transcripts that in any way suggests that the questioners deployed improper force or threats of any kind to overbear the defendant's will.  The recordings depict calm and cordial conversations.  The defendant is heard making jokes and small

talk.  And he readily acknowledged an understanding of his *Miranda* rights each time they were explained to him.

The defendant here has not pointed to any circumstances suggesting doubt about the fact that he "possessed the level of comprehension necessary to make his waiver knowing and intelligent."  *Abdi*, 827 F. Appx at 507-08.  He also has not identified any nominal deficiency in the advice of rights that was given. "'The Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege'"; it "simply requires 'that the suspect be fully advised' of the privilege not to be a witness against himself."  *Ibid.* (quoting *Colorado v. Spring*, 479 U.S. at 574); *see also Duckworth v. Eagan*, 492 U.S. 195, 203 (1989) ("The inquiry is simply whether the warnings reasonably convey to a suspect his rights as required by *Miranda*.").  It is undisputed that the defendant is an adult male, 31 years old, completed high school and community college, and has served on active duty in the U.S. Army.  He apparently is fluent in English and has lived in America for most of his adult life.  There are no overt deficiencies in the recitations of rights captured by recordings and transcripts of the two interviews that took place after the search and arrest.

The defendant contends that he was in a fragile mental state due to the use of "assault rifles" by the search team, which he was familiar with as highly deadly weapons from his military training.  However, the fact that the defendant was enlisted in the military cuts both ways; presumably having been subjected to combat training — which he says included live fire training in simulated combat — he would be more able than a typical civilian to remain calm and collected when confronted by persons wielding military type weapons.  The defendant has not presented any evidence substantiating any "trauma" resulting from his military service, and during the interview

excerpts he told one interrogator that during his military service he saw a counselor only a few times for "depression" and discontinued that counseling on his own initiative.

Moreover, even if the defendant could make some substantial showing of mental fragility, a showing of compromised mental state alone is insufficient to invalidate the waiver of rights. "[W]hile mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry." *Connelly*, 479 U.S. at 165. "[T]he Fifth Amendment privilege is not concerned 'with moral and psychological pressures to confess emanating from sources other than official coercion.'" *Id.* at 170 (quoting *Oregon v. Elstad*, 470 U.S. 298, 305 (1985)).

The agents on the scene evidently perceived an advantage by electing to interrogate the defendant immediately at the scene of the search and arrest. But that opportunism does not amount to the type of "police overreaching" that the Supreme Court has required courts to find before a defendant's statements should be suppressed. *Connelly*, 479 U.S. at 165 (citing *Moran v. Burbine*, 475 U.S. at 421) ("[T]he relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception."); *Fare v. Michael C.*, 442 U.S. 707, 726-727 (1979) (finding that the defendant was "not worn down by improper interrogation tactics or lengthy questioning or by trickery or deceit. . . . The officers did not intimidate or threaten respondent in any way. Their questioning was restrained and free from the abuses that so concerned the Court in *Miranda*."). There is no indication in the audio excerpts that the questioning of the defendant by agent Alley amounted to "coercion of a confession by physical violence or other deliberate means calculated to break his will," and there is no "evidence that his will was overborne and his capacity for self-determination critically impaired because of coercive police conduct." *Abdi*, 827 F. Appx at 507 (quoting *Spring*, 479

- 25 -

U.S. at 573-74; *Elstad*, 470 U.S. at 312); *see also United States v. Yousef*, 925 F. Supp. 1063, 1077 (S.D.N.Y. 1996) (citing *Elstad*, 470 U.S. at 304; *Connelly*, 479 U.S. at 162).

In strikingly similar circumstances, it has been held that roadside interrogation by members of a warrant execution team did not render a confession involuntary.  *E.g.*, *United States v. Greaux-Gomez*, 52 F.4th 426, 430–32 (1st Cir. 2022) (Upholding an interrogation conducted under similar circumstances during the execution of a search warrant).

Finally, it has been held that the mere presence of armed officers at the scene of an arrest or search is not in itself evidence of a "coercive" situation, since the public is familiar with the fact that police are armed (sometimes heavily so).   After all, the warnings are not even required unless the subject is in custody, with all of the coercive features of that status.   Moreover, the entire purpose of the advice of rights is to dispel and negate the inherently coercive atmosphere that might otherwise be suggested by such accoutrements of aggressive law enforcement.  *See United States v. Jackson*, 149 F. App'x 69, 72 (3d Cir. 2005) ("It is unremarkable that Jackson was transported by armed officers, placed in restraints, and processed with fingerprinting and mug shots while interviewed. These are quintessential trappings of custody recognized as inherently coercive by *Miranda* and subsequent cases. However, properly administered Miranda warnings are deemed to dispel the greater part of that intrinsic coercion, and, as we have noted, that Jackson was validly informed of his rights and chose to waive them initially is not in question.") (citing *Rhode Island v. Innis*, 446 U.S. 291, 310 (1980) (Stevens, J., dissenting) ("In *Miranda* the Court required the now-familiar warnings to be given to suspects prior to custodial interrogation in order to dispel the atmosphere of coercion that necessarily accompanies such interrogations.").

The defendant contends that officers around him were armed and dressed in "tactical gear," but there has been no suggestion that the defendant was threatened or that any weapons were drawn

or brandished *during questioning*. *See United States v. Guevara-Lopez*, No. 21-01581, 2022 WL 682626, at *3 (D. Ariz. Mar. 8, 2022) ("Although Deputy Baptista was uniformed and armed, he did not unholster his weapons or otherwise draw attention to them.") (citing *United States v. Drayton*, 536 U.S. 194, 205 (2002) ("That most law enforcement officers are armed is a fact well known to the public. The presence of a holstered firearm thus is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon.")); *United States v. Gonzalez-Zea*, 995 F.3d 1297, 1307 (11th Cir. 2021) ("Although the officers were armed during the interaction with Gonzalez-Zea, they never removed their weapons. Officers routinely carry weapons while on duty and, therefore, the mere presence of a weapon on an officer does not render an encounter with an officer unduly coercive and is insufficient to render a defendant's consent involuntary." (citing *Drayton*, *supra.*))

The government has shown that the defendant knowingly and voluntarily waived his rights to silence and to counsel before giving his statements to the agents. The defendant has not rebutted that showing or otherwise established that his statements were involuntary. The motion to suppress statements will be denied.

## VI. Conclusion

The defendant has not shown that the indictment is multiplicitous or that it charges any offense beyond the jurisdiction of federal law to regulate. He also has not established that the warrant affidavit was defective or failed to demonstrate probable cause, or that a *Franks* hearing is warranted to explore any "material omissions" by the affiant. The circumstances of the roadside interrogation were not overtly coercive based on any information presented.

Accordingly, it is **ORDERED** that the defendant's motions to dismiss counts of the indictment due to multiplicity (ECF No. 25), to suppress evidence from the search warrant

execution and for *Franks* hearing (ECF No. 26), to dismiss for lack of commerce nexus (ECF No.

27), and to suppress statements (ECF No. 28) are **DENIED**.

s/David M. Lawson

DAVID M. LAWSON

United States District Judge

Dated:   May 23, 2023